QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
  Gary E. Gans (Bar No. 89537)
  garygans@quinnemanuel.com
  Diane Cafferata (Bar No. 190081)
  dianecafferata@quinnemanuel.com
  William Odom (Bar No. 313428)
  williamodom@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100

Attorneys for Plaintiff
BANK LEUMI, USA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BANK LEUMI, USA,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>OPEN ROAD FILMS, LLC; GLOBAL ROAD ENTERTAINMENT, LLC; TANG MEDIA PARTNERS, LLC; AND DOES 1-10, INCLUSIVE,<br><br>　　　　　　Defendants. | Case No. 2:18 cv 7573<br><br>**COMPLAINT FOR:**<br><br>　**1. BREACH OF CONTRACT**<br>　**2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>　**3. INTENTIONAL INTERFERENCE WITH CONTRACT**<br>　**4. TRADE LIBEL**<br>　**5. DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action for state law claims based on complete diversity of citizenship under 28 U.S.C. §1332(a)(1). There is complete diversity between the parties, as alleged below, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

2. This Court has personal jurisdiction over the defendants because they reside and/or conduct business in the State of California, and because they have consented to personal jurisdiction in California by virtue of the forum-selection clause contained in § 10.7 of the Distributor Interparty Agreement (as hereinafter described) governing the parties' relationship, which states: "Any matter arising under this Agreement (subject to the arbitration provisions hereof) and including, without limitation, any suit to enforce an award under the arbitration provisions hereof, must be finally adjudged or determined in any court or courts of the State of California or of the United States of America, in Los Angeles County, California, and the parties hereto hereby submit generally and unconditionally and exclusively to the jurisdiction of such courts and of any of them in respect to any such matter and consent to service of process by any means authorized by California law."

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in and maintain their principal place of business in Los Angeles, and because they have consented to venue in this County by virtue of the forum-selection clause contained in the contract governing the parties' relationship as alleged in paragraph 2, above.

4. Plaintiff has filed a related case in the Central District of California, Western Division, entitled *Bank Leumi, USA v. Miramax Distribution Services, LLC, et al.*, in which Miramax Distribution Services, LLC ("Miramax"), a third-party from the perspective of this case, is a defendant. Miramax neither is incorporated in, nor has its principal place of business in New York, and its presence in this action would not defeat diversity jurisdiction.

# THE PARTIES

5. Plaintiff Bank Leumi is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

6. Plaintiff is informed and believes, and on that basis alleges, that Defendant Open Road Films, LLC ("Open Road") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California. Plaintiff is further informed and believes, and on that basis alleges, that Open Road is the predecessor-in-interest to Defendant Global Road Entertainment, LLC. Plaintiff is further informed and believes, and on that basis alleges, that Open Road is a wholly owned subsidiary of Defendant Tang Media Partners, LLC. Open Road is a motion picture distributor.

7. Plaintiff is informed and believes, and on that basis alleges, that Defendant Global Road Entertainment, LLC ("Global Road") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California. Plaintiff is further informed and believes, and on that basis alleges, that Global Road is the successor-in-interest to Open Road. Plaintiff is further informed and believes, and on that basis alleges, that Global Road is a wholly owned subsidiary of Defendant Tang Media Partners, LLC. Global Road is a motion picture distributor.

8. Plaintiff is informed and believes, and on that basis alleges, that Defendant Tang Media Partners, LLC ("Tang") is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Los Angeles, California. Plaintiff is informed and believes, and on that basis alleges, that Tang wholly owns and controls Open Road and Global Road.

9. Plaintiff is presently unaware of the true names and capacities of defendants Does 1 through 10, inclusive, and accordingly sues said defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges,

1  that each of the fictitiously named defendants is responsible in some manner for the
2  occurrences alleged herein.  Plaintiff will amend this complaint to state their true
3  names and capacities when such names have been ascertained.

4      10.    Plaintiff is informed and believes, and on that basis alleges, that at all
5  times mentioned herein, each defendant acted as the actual or ostensible agent,
6  employee and/or co-conspirator of each other defendant and/or of third-party
7  Miramax and, in performing the actions alleged herein, acted in the course and scope
8  of such agency, employment and/or conspiracy.  Plaintiff is further informed and
9  believes, and on that basis alleges, that each defendant succeeded to or assumed the
10 liabilities, and/or ratified the actions, of each other defendant with respect to the
11 matters alleged herein.  Whether by virtue of succession, assignment, or principles of
12 agency, Open Road, Global Road, and Tang are jointly and severally liable for the
13 breaches of contract and other violations of common-law duty described herein.

## FACTUAL ALLEGATIONS

15     11.    In 2013, a motion picture production company named Good Films
16 Enterprises, LLC ("Good Films" or "Borrower") acquired rights to produce a motion
17 picture based on Randall Sullivan's non-fiction novel, *LAbyrinth*, which chronicled
18 corruption in the Los Angeles Police Department surrounding its investigation into
19 the murders of rappers Tupac Shakur and Biggie Smalls.  Johnny Depp was cast in
20 the lead role as the detective heading the investigation.

21     12.    Good Films brought the project to the attention of Open Road and
22 another motion picture distributor, Miramax (together with Open Road, the
23 "Distributors").  Open Road and Miramax agreed to finance the development and
24 production of a feature-length theatrical motion picture based on *LAbyrinth* (the
25 "Picture") and to distribute the Picture in the United States and other territories around
26 the world.  Accordingly, Good Films entered into a Production Financing and
27 Distribution Agreement, dated as of November 4, 2016, with Open Road and
28 Miramax (the "Distribution Agreement").  Pursuant to the Distribution Agreement,

the Distributors agreed to distribute the Picture and to pay minimum guaranteed sums to Good Films ("Minimum Guarantees") upon the delivery of the completed motion picture. The title of the Picture was changed to *City of Lies*.

13. In particular, under the Distribution Agreement, Good Films granted Open Road, *inter alia*, certain exclusive rights to distribute the Picture (i) in domestic territories, *i.e.*, the United States and related territories (not including free television rights which, as alleged below, were granted to Miramax) (the "Open Road Domestic Rights"); (ii) in certain international territories (the "Open Road International Rights"); and (iii) for airlines (the "Airline Rights"). In consideration for this grant of distribution rights, Open Road agreed, *inter alia*, (i) to pay a total Minimum Guarantee of $5,400,000 (the "Open Road Minimum Guarantee"), consisting of $5,050,000 for the Open Road Domestic Rights and $350,000 for the Airline Rights); and (ii) to release the Picture theatrically in the domestic territories in no fewer than 1,800 theatres with an expenditure of no less than $10,000,000 for "P&A" expenses, *i.e.*, certain marketing and distribution expenses (the "Release Commitment").

14. Furthermore, under the Distribution Agreement, Good Films granted Miramax, *inter alia*, certain distribution rights for free television in the domestic territories (the "Miramax Domestic Rights"). In consideration for this grant of rights, Miramax agreed, *inter alia*, to pay a total Minimum Guarantee of $4,250,000 (the "Miramax Minimum Guarantee"). In a separate transaction, Good Films granted Miramax distribution rights in certain international territories for a minimum guarantee of $1,000,000 (the "Miramax International Guarantee").

15. Certain of the international rights were handled by a related company, Open Road International, which had a series of "output agreements" with international distributors, with each such distributor agreeing to pay its own minimum guarantee to Good Films. One of the output agreements entered into by Open Road International was with Sony Pictures Worldwide Acquisitions, Inc. ("Sony"). Pursuant to the output agreement with Sony (the "Sony Agreement"), Sony acquired

rights to distribute the Picture in certain international territories in consideration for the payment of a minimum guaranty. A portion of the minimum guaranty, $5,949,609.85, was contingent upon Open Road fulfilling its commitment to release the Picture theatrically in the domestic territories in no fewer than 1,800 theatres with a P&A expenditure of no less than $10,000,000 (the "Sony Minimum Release Criteria Payment").

16. As part of the complex financing for the production of the Picture, Good Films obtained a loan from Bank Leumi (the "Production Loan"). As of December 16, 2016, Good Films, as "Borrower," and Bank Leumi, as "Lender," entered into a Loan and Security Agreement (the "Loan Agreement") to finance part of the cost of production and delivery of the Picture. Pursuant to the Loan Agreement, Bank Leumi agreed to lend Good Films up to $23,189,227. In consideration, Good Films agreed, *inter alia*, to repay all amounts advanced by Bank Leumi and granted Bank Leumi a first-priority security interest in all of Good Films' rights to and interest in the Picture, including all distribution rights and contracts and all proceeds thereof.

17. Thus, the obligations of Open Road and Miramax under the Distribution Agreement were part of the security for the Production Loan. To protect Bank Leumi's security interest, Open Road and Miramax agreed to pay their Minimum Guarantees directly to Bank Leumi. Accordingly, Bank Leumi, Good Films, Open Road, and Miramax (and other parties) entered into a Distributor Interparty Agreement dated as of December 16, 2016 (the "IPA"). A true and correct copy of the IPA is attached as Exhibit 1.

18. Pursuant to the IPA, Open Road agreed, *inter alia*, to pay the Open Road Minimum Guarantee of $5,400,000 directly to Bank Leumi. The only condition to payment of the Open Road Minimum Guaranty is the delivery of certain film materials. Open Road waived all defenses to payment other than delivery, including any defense based on a breach by Good Films of the Distribution Agreement. In addition, Open Road agreed that if it failed to satisfy its Release Commitment, it

-5-
08587-00001/10374203.6                                                    PLAINTIFF BANK LEUMI, USA'S COMPLAINT

1 would pay to Bank Leumi the Sony Minimum Release Criteria Payment of
2 $5,949,609.85.

3   19.   Also pursuant to the IPA, Miramax agreed, *inter alia*, to pay the Miramax Minimum Guarantee of $4,250,000 directly to Bank Leumi. The only condition to payment of the Miramax Minimum Guaranty is the delivery of certain film materials to Open Road; delivery to Open Road constitutes delivery to Miramax as well. Miramax waived all defenses to payment other than such delivery, including any defense based on a breach by Good Films of the Distribution Agreement.

   20.   Article 3 of the IPA establishes the delivery procedures. On February 13, 2018, Good Films delivered to Open Road the "Mandatory Delivery Materials" as that term is defined in the IPA, and on March 15, 2018, Good Films delivered to Open Road the "Complete Delivery Materials," as that term is defined in the IPA. Consistent with its obligation under the IPA, Good Films provided a notice to the Distributors stating that delivery had been effected.

   21.   The delivery procedures under the IPA contain a process for inspection of the delivery materials, objection if any materials were not delivered or did not satisfy the delivery requirements, and cure of any deficiencies in delivery. Open Road objected twice to aspects of delivery, and Good Films effected cures of all alleged deficiencies. Thereafter, neither Open Road nor Miramax objected further. Under § 3.2(a) of the IPA, the Distributors' failure to timely object to delivery after tender or cure means that "delivery shall then be conclusively deemed to have been effected." Consequently, "Mandatory Delivery" was conclusively deemed effected on June 19, 2018, and "Complete Delivery" was conclusively deemed effected on July 26, 2018. Thus, the only condition to payment of the Minimum Guarantees has been satisfied.

   22.   On July 10, 2018, Good Films informed Bank Leumi that Global Road had confirmed it had accepted delivery and was "readying payment."

23. On July 11, 2018, Bank Leumi received an email from an executive at Miramax stating: "I've been told we are also good to go on payment. I'll let you know if it'll be today or tomorrow later today." However, the next day, Miramax informed Bank Leumi: "I hear … that Global Road has not made their payment yet. We are waiting to hear from Global Road. I hope to get back to you soon."

24. However, neither Open Road nor Miramax has paid the balance of its Minimum Guarantee due upon delivery of the Picture (they did pay deposits of 10% of their Minimum Guarantees as required by the IPA). Furthermore, Open Road has informed Good Films that it does not intend to release the Picture at all, thereby failing to satisfy its Release Commitment and, accordingly, interfering with Sony's obligation to pay the Minimum Release Criteria Payment (assigned by Good Films to Bank Leumi).

25. On July 17, 2018, Good Films' representatives had a telephone conference with Robert Friedman, the Chief Executive Officer of Open Road, Global Road, and Tang, in which Mr. Friedman said they were "not going to accept the movie because of the current environment surrounding it" and that they did not intend to honor their payment obligations.

26. On July 30, 2018, Bank Leumi sent a letter to Open Road stating that it had not received the payment due from Open Road under the IPA, requesting payment, and writing that if it did not receive a response, it would assume that Open Road did not intend to comply with its obligation. Open Road did not respond.

27. On August 6, 2018, Bank Leumi's counsel sent a letter to Open Road stating that delivery had been effected, payment of the Open Road Minimum Guarantee had not been received, and Bank Leumi had been informed by Good Films that Open Road did not intend to release the Picture or otherwise take the actions necessary to satisfy the Release Commitment. Accordingly, Bank Leumi requested that Open Road confirm that Open Road would pay the Open Road Minimum Guarantee and take the actions necessary to satisfy the Release Commitment. Counsel

wrote that a failure to respond would be deemed by Bank Leumi to be a repudiation by Open Road of its obligation to pay the Open Road Minimum Guarantee and confirmation that it would not take the actions necessary to satisfy the Release Commitment. Open Road did not respond.

28. On August 24, 2018, Bank Leumi's counsel sent another letter to Open Road, stating that Open Road had not responded to counsel's letter of August 6, had not paid the amounts due under the IPA and, accordingly, pursuant to Paragraph 5.1(i) of the IPA, Open Road was in default and all of its rights and interests in the Picture had automatically divested and terminated. Counsel requested that Open Road confirm the divestiture and termination, promptly return to Good Films all delivery materials that had been delivered to it, and pay the amounts due under the IPA, *i.e.*, the balance of the Open Road Minimum Guarantee of $4,860,000 and the Sony Minimum Release Criteria Payment of $5,949,609.85, plus interest. To date, Open Road has not responded.

29. On July 25, 2018, Bank Leumi sent a letter to Miramax stating that delivery of the Picture to Miramax had been completed but that Bank Leumi had not received the payment due from Miramax under the IPA, and requesting payment in the amount of $3,825,000.

30. On July 27, 2018, counsel for Miramax responded to Bank Leumi's letter of July 25. Counsel wrote that it had been informed by Global Road "f/k/a" Open Road that it is not accepting delivery of the Picture and, "[i]nsofar as Global Road is not accepting delivery, Miramax is not accepting delivery." Counsel further wrote that there were "significant problems with the production which have significantly devalued the Picture, including, without limitation, the highly publicized alleged off-screen conduct of Johnny Depp, as well as a lawsuit filed against Mr. Depp and the production because he allegedly physically attacked a crew member on the set of the Picture." Then, purportedly relying on the terms of the Distribution Agreement, Miramax's counsel concluded that "no payment is due."

31.     On August 8, 2018, Bank Leumi's counsel sent a letter to Miramax stating that delivery had been effected and payment of the Miramax Minimum Guarantee had not been received.  Accordingly, counsel requested that Miramax confirm that Miramax would pay the Miramax Minimum Guarantee or, if Miramax did not intend to do so, to state the basis upon which Miramax asserts that it is not obligated to pay.

32.     On August 10, 2018, and in subsequent correspondence on August 17 and 22, Miramax's counsel responded to the effect that Miramax would not pay the Miramax Minimum Guarantee because it was informed by Global Road that Global Road had refused delivery and there were "unresolved objections/challenges to delivery," and because the lack of a "wide domestic theatrical release of the Picture" by Global Road diminished the value of Miramax's rights under the Distribution Agreement.  Neither Miramax nor its counsel ever identified any specific objection to, or deficiency in, delivery under the IPA, and neither ever identified any provision of the IPA that required a theatrical release of the Picture or anything other than delivery as a condition to payment.

33.     To date, neither Open Road nor Miramax has paid its Minimum Guarantee, and neither has stated any defense to payment under the IPA.

34.     Furthermore, Open Road has failed to release the Picture theatrically.  Although it was scheduled to release the Picture on September 7, 2018, Plaintiff is informed and believes, and on that basis alleges, that Open Road, Global Road and/or Tang informed members of the media that the release of the Picture would be postponed to a later date because allegations made against Johnny Depp made it difficult to market the Picture at this time and damaged the commercial value of the Picture.  Any such statement would have been false because the real reason Open Road would not release the Picture is because Open Road and Global Road are in financial distress and decided  not to pay the $10,000,000 of marketing and distribution expenses Open Road committed to pay.

35. As a result of defendants' actions, the value of the Picture has been damaged, other distributors have not paid minimum guarantees for distribution rights, and the ability of Good Films to re-license the Picture to other domestic and international distributors has been severely impaired. Consequently, Good Films, as the Borrower under the Loan Agreement, has been unable to repay the Production Loan. As of this filing, Bank Leumi is owed principal of $19,427,101.87, along with interest of $273,533.62, for a total of $19,700,635.49 under the Loan Agreement.

## **FIRST CAUSE OF ACTION**
## **(BREACH OF CONTRACT)**
### **(By Plaintiff Against All Defendants)**

36. Plaintiff incorporates by reference each and all of the allegations contained in paragraphs 1 through 35 hereof, as if fully set forth herein.

37. The IPA is a valid and enforceable written contract between Bank Leumi, Open Road, Global Road, and Tang, among other parties.

38. Bank Leumi has performed all conditions and covenants to be performed by it under the IPA except to the extent its performance was excused. Furthermore, the sole condition to Defendants' performance under the IPA has been satisfied, *i.e.*, delivery has been effected; in fact, delivery has been conclusively deemed to have been effected. Bank Leumi has demanded that Defendants perform their obligations under the IPA, but they have failed and refused to do so without excuse.

39. Defendants have breached the IPA by, *inter alia*, (i) failing and refusing to pay the balance of the Open Road Minimum Guaranty in the amount of $4,860,000; and (ii) failing and refusing to satisfy the Minimum Release Criteria and to pay the Sony Minimum Release Criteria Payment in the amount of $5,949,609.85.

40. As an actual and proximate result of Defendants' breaches of contract, Bank Leumi has been damaged in an amount in excess of $10,809,609, together with interest thereon.

41. The IPA provides that the prevailing party in any action related to the agreement shall be entitled to recover its reasonable attorneys' fees incurred in connection therewith. Therefore, Bank Leumi is entitled to recover its attorneys' fees and costs incurred herein.

## SECOND CAUSE OF ACTION
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### (By Plaintiff Against All Defendants)

42. Plaintiff incorporates by reference each and all of the allegations contained in paragraphs 1 through 41 hereof, as if fully set forth herein.

43. The IPA contains an implied covenant of good faith and fair dealing which requires that the parties deal with each other in good faith to accomplish the purposes of the contract and not engage in conduct to deprive another party of the benefits of the contract.

44. Defendants breached the implied covenant of good faith and fair dealing in the IPA by, *inter alia,* (i) refusing to accept delivery despite having no valid contractual basis for doing so; (ii) asserting, and informing other distributors, that there were "unresolved objections/challenges to delivery;" (iii) representing to members of the media that they were pushing the release of the Picture back, rather than that they were not accepting delivery or would not release the film, which was false and made it more difficult for Good Films to re-sell rights in the Picture; (iv) disparaging the Picture, decreasing the value of the Picture and Bank Leumi's collateral, by claims about Johnny Depp and the value of the Picture in the "current environment;" (v) refusing to distribute the Picture and to spend the money necessary to market and distribute the Picture; and (vi) substantially delaying informing Bank Leumi and Good Films that they did not intend to honor their obligations under the

IPA, thereby diminishing the resale value of the Picture and further impeding Good Film's ability to repay the Production Loan.

45. As an actual and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Bank Leumi has been damaged in an amount to be proved at trial, together with interest thereon.

46. The IPA provides that the prevailing party in any action related to the agreement shall be entitled to recover its reasonable attorneys' fees incurred in connection therewith. Therefore, Bank Leumi is entitled to recover its attorneys' fees and costs incurred herein.

### **THIRD CAUSE OF ACTION**
### **(INTENTIONAL INTERFERENCE WITH CONTRACT)**
### **(By Plaintiff Against All Defendants)**

47. Plaintiff incorporates by reference each and all of the allegations contained in paragraphs 1 through 46 hereof, as if fully set forth herein.

48. Defendants were aware that Bank Leumi had a valid, enforceable contract – *i.e.*, the IPA – with Miramax; a valid, enforceable contract – *i.e.*, the Loan Agreement – with Good Films; a valid, enforceable contract – *i.e.*, the Sony Agreement – with Sony; and valid, enforceable contracts with certain international distributors for the distribution of the Picture.

49. Defendants were obligated to act reasonably and in good faith toward Bank Leumi. But to protect their reputations or for other improper motives, they communicated different things to different people such as not accepting or releasing the Picture because of objections to delivery, not accepting or releasing the Picture because of issues involving Johnny Depp, and merely pushing back the release of the Picture, all of which are inconsistent and false. This caused Miramax and other distributors not to pay minimum guarantees, and made it impossible for Good Films to repay the Production Loan. Further, Defendants damaged the value of the Picture

-12-

by making statements that they were rejecting delivery of the Picture and/or were not releasing the Picture because of issues involving Johnny Depp and the "current environment" surrounding the Picture. These inconsistent and false statements caused confusion in the market, diminishing the value of the Picture and interfering with re-selling rights in the Picture. Defendants knew these statements would induce Miramax and other distributors to refuse to pay minimum guarantees and would cause Good Films to be unable to repay the Production Loan.

50. In particular, Defendants interfered with each of these contracts by, *inter alia,* (i) refusing to accept delivery, despite having no valid contractual basis for doing so, and misrepresenting the reason for not accepting delivery; (ii) misrepresenting to Good Films and others that Open Road or Global Road had not accepted delivery because of deficiencies in delivery, asserting that there were "unresolved objections/challenges to delivery" and the value of the Picture was diminished because of allegations against Johnny Depp; (iii) representing to members of the media that they were pushing the release of the Picture back, rather than that they were not accepting delivery or would not release the film, which was false and made it more difficult for Good Films to re-sell rights in the Picture; (iv) disparaging the Picture, thereby decreasing the value of the Picture and the Bank's collateral, by claims about Johnny Depp and the value of the Picture in the "current environment"; (v) making inconsistent and false statements about the Picture causing confusion in the market; (vi) refusing to distribute the Picture and to spend the money necessary to market and distribute the Picture while misrepresenting the reason for not doing so; (vii) falsely representing that Global Road had rights to distribute the Picture; and (viii) concealing from Bank Leumi and Good Films when they first determined that they did not intend to honor their obligations under the IPA, thereby diminishing the resale value of the Picture and further impeding Good Film's ability to repay the Production Loan.

51. As a result of Defendants' actions, Miramax followed Defendants in breaching the IPA. On July 11, 2018, Miramax told Bank Leumi that it was "good to go on payment." However, after Defendants informed Miramax that there were "unresolved objections/challenges to delivery" and Defendants refused to release the Picture, Miramax changed course and refused to pay the Miramax Minimum Guarantee.

52. As a further result of Defendants' actions, Sony has not paid its minimum guarantee under the Sony Agreement and other international distributors have failed to pay minimum guarantees for the Picture.

53. As a further result of Defendants' actions and the consequent failure of other distributors to pay minimum guarantees, it has become impossible for Good Films to repay the Production Loan and, therefore, Good Films is or will be in breach of the Loan Agreement.

54. As an actual and proximate result of Defendants' interference with contract, Bank Leumi has been damaged in an amount to be proved at trial, together with interest thereon.

55. In doing the acts alleged herein, Defendants acted despicably, with oppression, fraud and malice, and with willful and conscious disregard of Bank Leumi's rights. Therefore, Bank Leumi is entitled to recover exemplary and punitive damages in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
### (TRADE LIBEL)
### (By Plaintiff Against All Defendants)

56. Plaintiff incorporates by reference each and all of the allegations contained in paragraphs 1 through 55 hereof, as if fully set forth herein.

57. By misrepresenting the facts concerning delivery of the Picture and their reasons for not releasing the Picture – *i.e.*, there were "unresolved

objections/challenges to delivery" and the release of the Picture would be postponed because of issues involving Johnny Depp – Defendants have made statements that disparaged the commercial quality of the Picture.

58. Plaintiff is informed and believes, and on that basis alleges, that Defendants' statements were made to Miramax, other distributors, and members of the media.

59. Defendants' statements were untrue because there were no unresolved objections or challenges to delivery and the release of the Picture was not postponed because of issues involving Johnny Depp (the real reason was Defendants' financial condition). Defendants knew that their statements were untrue or acted with a reckless disregard for the truth or falsity of the statements.

60. Defendants knew or should have known that other persons might act in reliance on their statements.

61. Bank Leumi has suffered direct financial harm because other persons acted in reliance on Defendants' statements, including Miramax, other distributors and other potential distributors of the Picture, and Good Films is now unable to repay the Production Loan.

62. As an actual and proximate result of Defendants' trade libel, Bank Leumi has been damaged in an amount to be proved at trial, together with interest thereon.

63. In doing the acts alleged herein, Defendants acted despicably, with oppression, fraud and malice, and with willful and conscious disregard of Bank Leumi's rights. Therefore, Bank Leumi is entitled to recover exemplary and punitive damages in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION
## (DECLARATORY RELIEF)
### (By Plaintiff Against All Defendants)

64. Plaintiff incorporates by reference each and all of the allegations contained in paragraphs 1 through 63 hereof, as if fully set forth herein.

65. An actual controversy has arisen and now exists between Plaintiff, on the one hand, and Defendants, on the other hand, concerning their respective rights and interests with respect to the IPA, the Picture, and the distribution rights for the Picture. Plaintiff contends that all of Defendants' rights and interests in and to the Picture, including all rights to distribute the Picture and all rights to film materials for the Picture, have been divested and terminated. Plaintiff is informed and believe, and on that basis allege, that Defendants deny Plaintiff's contentions.

66. Plaintiff seeks a judicial determination of the parties' rights and interests in and to the Picture, including that Defendants have no rights to distribute the Picture, no rights to any film materials for the Picture, and no other rights in or to the Picture.

67. A judicial declaration is necessary and appropriate under the circumstances so that Plaintiff and Defendants may ascertain their rights, interests, obligations, and duties with respect to foregoing and to avoid a multiplicity of actions.

WHEREFORE, Plaintiff Bank Leumi, USA prays for a judgment against Defendants Open Road Films, LLC, Global Road Entertainment, LLC, and Tang Media Partners, LLC as follows:

1. For damages in an amount to be proved at trial, together with interest thereon;
2. For punitive damages in an amount to be proved at trial;
3. For an award of reasonable attorneys' fees and costs incurred herein;
4. For declaratory relief; and
5. For any and all other relief the Court deems just and proper.

| | | |
|---|---|---|
| 1 | Dated: August 29, 2018 | Respectfully submitted,<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 2 | | |
| 3 | | By: */s/ Gary E. Gans* |
| 4 | | Gary E. Gans (Bar No. 89537)<br>garygans@quinnemanuel.com |
| 5 | | Diane Cafferata (Bar No. 190081)<br>dianecafferata@quinnemanuel.com |
| 6 | | William Odom (Bar No. 313428)<br>williamodom@quinnemanuel.com |
| 7 | | |
| 8 | | *Attorneys for Plaintiff Bank Leumi, USA* |

-17-

# **REQUEST FOR JURY TRIAL**

Plaintiff Bank Leumi hereby demands a trial by jury on all issues.

Dated: August 29, 2018

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Gary E. Gans*
Gary E. Gans (Bar No. 89537)
garygans@quinnemanuel.com
Diane Cafferata (Bar No. 190081)
dianecafferata@quinnemanuel.com
William Odom (Bar No. 313428)
williamodom@quinnemanuel.com

*Attorneys for Plaintiff Bank Leumi, USA*